**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **GERALD ARICH** | : | **CIVIL ACTION NO. 3:02CV00958** |
| | : | **(WWE)** |
| **V.** | : | |
| | : | |
| **METRO-NORTH RAILROAD** | : | |
| **COMPANY** | : | **JUNE 30, 2004** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE
PLAINTIFF'S EXPERTS**

The Defendant Metro-North Railroad Company (hereinafter referred to as "Metro-North"), pursuant to Federal Rules of Evidence 104 and 702 moves to preclude the proffered testimony of the plaintiff's experts, Mark Cullen, M.D. and Mridu Gulati, M.D.

Both doctors have been disclosed by the plaintiff as medical experts who will testify that, in their opinion, the plaintiff's one time exposure to fire extinguisher materials while working for Metro-North caused him certain lung problems, specifically, a nodule on his lung known as bronchiolectasis.[1]

---

[1] Bronchiolectasis is defined as dilation of the bronchioles. TABOR'S CYCLOPEDIC MEDICAL DICTIONARY 296 (19th ed. 2001).

Because Dr. Cullen's and Dr. Gulati's opinions are not based upon reliable scientific methods, their opinions are inadmissible under Federal Rule of Evidence 702. <u>Daubert v. Merrell Dow Pharmaceuticals</u>, Inc. 509 U.S. 579, 113 S.Ct. 2786 (1993); <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 118 S.Ct. 512 (1997).

## **FACTS**

The plaintiff was employed by Metro-North as an engineer.  (Plaintiff's Depo. Transcript attached hereto and referred to as Exhibit "A"; p. 11, line 11).  He alleges that on February 8, 2000, while in the cab of a train car, he inhaled some of the contents of a fire extinguisher after the wind blew the materials off the floor, seats, and controls of the train towards him.  (Exhibit A, p. 29, line 6-9; p. 44, line 3-10; p. 63, line 21-22).  The  fire extinguisher contents had already been expelled  from the extinguisher prior to his entry onto the train car that day, and he had observed the white or gray powdery substance already present on the floor of  the train as he walked down the aisle toward the cab of the train car.  (Exhibit A; p. 35, line 20-23).  The plaintiff claims that he stood in the train with the fire extinguisher contents blowing around him from an open window for seven minutes.  (Exhibit A; p. 52, line 16-21).  The plaintiff claims that he remained in the train car with the powdery material for a total of twenty-five minutes. (Exhibit A; p. 61, line 20-21).  He later became nauseous, head-achy, and was coughing.

(Exhibit A; p. 69, line 4-5). He also claims to have developed shortness of breath, a hoarse voice, and wheeziness after this incident. (Exhibit A; p. 93, line 18-22).

It was not until January, 2001, that a CT scan definitively identified two nodules in the plaintiff's right lung. (1/16/01 CT scan attached hereto and referred to as Exhibit "B"). A 1.5 centimeter non-calcified nodule in the right lower lobe was identified along with a smaller 3 millimeter nodule in the superior segment of the right lower lobe. (Id.). Surgery performed on January 31, 2001 revealed bronchiolectasis of the larger 1.5 centimeter nodule, and calcification of the smaller nodule. (Dr. Altmeyer's 1/31/01 Pathology Report attached hereto and referred to as Exhibit "C"; Dr. Katzenstein's 2/7/01 Pathology Report attached hereto and referred to as Exhibit "D"; Dr. Cullen's Depo. Transcript attached hereto and referred to as Exhibit "E," p. 10, line 3-6). Both nodules were found to be benign after biopsy.[2] (Exhibit C, Exhibit D; Dr. Gulati's Depo. Transcript attached hereto and referred to as Exhibit "F", p. 50, line 24-25).

Dr. Cullen and Dr. Gulati are in agreement that the materials from the fire extinguisher are highly inert, inactive materials unlikely to cause a reaction. (Exhibit F, p. 56, line 12-16; Exhibit E, p. 11, line 17-21). The fire extinguisher content was predominantly baking soda. (Exhibit F, p. 56, line 24-25, p. 57, line 1-8). Dr. Cullen testified that there is nothing about the

[2] Dr. Cullen and the defendant's expert pulmologist, Dr. Maxfield, agree that the smaller nodule, which was calcified, could not have been caused by the plaintiff's exposure to fire extinguisher materials at work because the calcification indicates that it pre-dated the February, 2000 incident.

composition of the fire extinguisher materials that caused the plaintiff's condition.  (Exhibit E, p. 11, line 22-23).   Both doctors admit that no literature could be found linking the contents of a fire extinguisher or dust to lung nodules.  (Exhibit F, p. 58, line 15-23; Exhibit E, p. 14, line 6-9). Dr. Katzenstein, a pathologist who examined the section of the lung at the request of Dr. Altmeyer, stated "it is not possible to know the etiology of this bronchiolectasis."  (Exhibit D).

The plaintiff has disclosed Dr. Cullen and Dr. Gulati as experts who will testify as to the issue of causation of the larger lung nodule and bronchiolectasis therein.  Neither doctor was ever the plaintiff's treating physician.  (Exhibit F, p. 18, line 9-10).  Instead, they saw him in September, 2003, for a one time visit three years and seven months after the February, 2000 alleged inhalation incident.  (Exhibit F, p. 17, line 15-19; Exhibit E, p. 47, line 13-14).  Dr. Gullati may have spent one hour with him, and Dr. Cullen spent twenty minutes with him. (Exhibit F, p. 27, line 1-3; Exhibit E, p. 47, line 13-14).  These doctors saw the plaintiff at the request of the plaintiff's attorney and solely for the purpose of this litigation.  (Plaintiff's 8/22/03 Questionnaire for Cullen & Gulati attached hereto and referred to as Exhibit "G", p. 2; Exhibit F, p. 18, line  4-8).

When Dr. Cullen and Dr. Gulati saw the plaintiff more than three years after the alleged incident, the nodule, which had allegedly been caused by the inhalation incident, had already been removed and any symptoms he initially complained of had improved.  (Exhibit F, p. 71,

line 23-25; p. 72, line 10-12; Exhibit E, p. 54, line 5-6).  In fact, in September, 2003, the

plaintiff's pulmonary function was better after the alleged inhalation incident than it was in 1994,

prior to the incident.  (Exhibit F, p. 75, line 1-6).  Both doctors attempt to relate the plaintiff's

larger lung nodule and bronchiolectasis therein to the February, 2000 incident on the basis of

"differential diagnosis".   (Exhibit F, p. 94, line 6-10; Exhibit E, p. 63, line 24-25; p. 64, line 1-

3).  Dr. Cullen admits that the fire extinguisher dust that he opines caused the plaintiff's

condition is no different than any kind of dust or airborne particle that might be inhaled by

somebody.  (Exhibit E, p. 12, line 21-25).  The doctors base their opinion as to causation on

temporality and the plaintiff's reported symptoms.  (Exhibit F, p. 10, line 4-6; Exhibit E, p. 20,

line 10-13).

 Dr. Gulati and Dr. Cullen issued a report on October 10, 2003, stating:

> *"We do feel that while it is unusual and that there is scant medical literature documenting a case such as Mr. Arich's, the bronchiolectasis on his chest x-ray and pathology seems temporally related to his inhalation of the fire extinguisher material."*

(Dr. Gulati's & Dr. Cullen's 10/10/03 Report attached hereto and referred to as Exhibit "H", p. 3) (italics added).

 Dr. Gulati later testified that the "scant" medical literature that they referenced in the

report actually means that neither she nor Dr. Cullen found *any* medical literature supporting

their conclusion. (Exhibit F, p. 80, line 4-13; Exhibit E, p. 14, line 6-9).

## ARGUMENT & CITATION OF AUTHORITY

I.  **EXPERT TESTIMONY IS ONLY ADMISSIBLE IF IT COMPORTS WITH THE REQUIREMENTS OF THE FEDERAL RULES OF EVIDENCE AND DAUBERT**

Federal Rule of Evidence 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court of the United States held that when faced with a proffer of expert scientific testimony, Rule 702 requires a district court to determine whether the evidence rests on a reliable foundation. Id. at 597. The district court must determine whether the reasoning or methodology employed by the expert is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue. Id. at 592-94. Expert's opinions must amount to more than "subjective belief or unsupported speculation." Id. at 589-590.

Daubert established a "gatekeeping" function for trial courts. Id. at 597; See also FRE 104 (preliminary questions concerning the qualifications of a person to be a witness, or the admissibility of evidence shall be determined by the court). The gatekeeping function has since

been extended to apply to all expert testimony: specialized, technical, or scientific.  See Kumho

Tire v. Carmichael, 526 U.S. 137, 147-48, 119 S.Ct. 1167 (1999).  The objective of the

gatekeeping requirement is to ensure the reliability and relevance of expert testimony.  Id. at 152.

A trial judge acting as gatekeeper, must "ensure that any and all scientific testimony or evidence

admitted is not only relevant, but reliable."  Daubert at 589.

        In Daubert, the Court outlined a non-exclusive list of factors to consider in determining

whether expert testimony is sufficiently reliable to be admitted.  These factors include the

following: 1) whether the theory or technique can and has been tested,  2) whether the theory or

technique has been subjected to peer review and publication, 3) the known potential rate of error,

and the existence or maintenance of standards controlling the technique's operation, and 4)

whether the theory or technique has been generally accepted as valid by the relevant scientific

community.  See Daubert at 593-94.  In addition, the proffered testimony must "fit" the inquiry.

There must be a valid scientific connection to the pertinent inquiry as a precondition of

admissibility."  Id. at 591-592.

        In addition to scrutinizing the methodology of an expert, trial courts must also examine

the conclusions of the expert.

        . . . conclusion and methodology are not entirely distinct from one another.  Trained experts
        commonly extrapolate from existing data.  But nothing in either Daubert or the Federal Rules
        of Evidence requires a district court to admit opinion evidence that is connected to existing

data only by the *ipse dixit* of the expert.  A court may conclude that there is simply to great of an analytical gap between the data and the opinion offered.

 General Electric Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519 (1997).

The above requirements have been held to apply to physicians rendering opinions in cases involving toxic torts.  See General Electric Co. v. Joiner supra;  Amorgianos v. Amtrak; 303 F.3d 256 (2d Cir. 2002); Zwillinger v. Garfield Slope Housing Corp., 1998 U.S. Dist. Lexis 21107 (E.D.N.Y) (August 17, 1998) (Attached hereto as Exhibit "I"); Mancuso v. Consolidated Edison Co. of New York, 967 F. Supp. 1437 (S.D.N.Y) (July 2, 1997).

## II.    DR. CULLEN'S AND DR. GULATI'S OPINIONS BASED UPON A DIFFERENTIAL DIAGNOSIS SHOULD NOT BE USED IN THIS CASE TO ESTABLISH GENERAL CAUSATION BECAUSE THERE IS NO PROOF THAT FIRE EXTINGUISHER DUST CAN CAUSE LUNG NODULES

The differential diagnosis or differential etiology method applied by Dr. Cullen and Dr. Gulati in this case is invalid and inadmissible because there is no showing of general causal proof that fire extinguisher material is capable of causing lung nodules.  In the medical community, a differential diagnosis or differential etiology is recognized as "a systematic comparison of symptoms to determine which of two or more *conditions* is the one from which a patient is suffering."  Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000) (citing STEDMAN'S MEDICAL DICTIONARY 474 (26th ed. 1995) (emphasis in original).   In comparison,

the legal community, plaintiffs attempting to establish the causal element of their claim, often identify a "differential diagnosis" as a type of *causal* diagnosis.  See, e.g. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999) (identifying differential diagnosis as a technique that identifies the cause of a medical condition by eliminating the *likely* causes until the most probable cause is isolated."  See Turner at 1208 (emphasis added).  In McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995), the Second Circuit Court of Appeals recognized that differential etiology "requires listing *possible* causes, then eliminating all causes but one." (emphasis added).

While both doctors claim to have performed a "differential diagnosis", that methodology was flawed in this case in that the proffered experts failed to properly "rule in" the plaintiff's inhalation of fire extinguisher materials while working for Metro-North as a potential *cause* of his condition.   "[I]t is also important to recognize that a fundamental assumption underlying this method [differential diagnosis] is that the final suspected 'cause' remaining after this process of elimination must actually be *capable* of causing the injury.  That is, the expert must 'rule in' the suspected cause as well as 'rule out' other possible causes. And, of course, expert opinion on this issue of 'general causation' must be derived from a scientifically valid methodology."  Cavallo v. Star Enterprise, 892 F. Supp. 756, 771 (E.D.Va. 1995) aff'd in relevant part 100 F.3d 1150 (4th Cir. 1996) (emphasis in original).   In Cavallo , the court explained, "'[g]eneral causation' refers

to whether X *can* cause Y . . . On the other hand, 'specific causation' refers to whether X *did* cause Y in a given case.  See Casey, 877 F. Supp. at 1383.  It is in determining specific causation that differential diagnosis is helpful."  Id. at n34;  Casey v. Ohio Medical Products, 877 F. Supp 1380 (N.D. Cal. 1995).

The causation principles applicable in tort cases include "general causation" (whether a substance is capable of causing a particular injury, and "specific causation" (whether a substance actually caused a specific individual's injury).  Federal Judicial Center, Reference Manual on Scientific Evidence, 444 (2d ed. 2000); Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997).  "A fundamental assumption underlying the differential diagnosis method is that the final suspected 'cause' remaining after the process of elimination must actually be *capable* of causing the injury."  Cavallo at 771.

In toxic tort, drug, and product liability  cases, there are questions of general causation and specific causation.  See generally Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256 (2d Cir. 2002), Zwillinger v. Garfield Slope Housing Corp., 1998 U.S. Dist. Lexis 21107 (E.D.N.Y) (August 17, 1998), Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1211 (10th Cir. 2002), Cavallo v. Star Enterprise, 892 F. Supp. 756, 771 (E.D. Va. 1995).  "A scientifically valid opinion on causation in a toxic tort case typically requires an analysis of whether there is a 'biologically plausible theory' by which the disease can be related to the

alleged chemical exposure; an examination of whether the plaintiff was exposed to the chemical in a manner that can lead to the absorption into the body; and an opinion as to whether the dose of the chemical to which the plaintiff was exposed is sufficient to cause the symptoms in issue." Zwillinger v. Garfield Slope Housing Corp. 1998 U.S. Dist. Lexis 21107 at 57.  In evaluating this relationship, "the expert must establish not only 'general causation' (that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause the specific types of injuries she alleges), but also 'specific causation' (that, more likely than not, the toxin caused the plaintiff's injuries in this particular case)." Id. at 57-58.

In Zwillinger, the court excluded the plaintiff's proffered expert doctor because he "failed to 'establish 'general causation,' by demonstrating that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause the specific types of injuries she alleges.'" Id. at 58, citing Mancuso, 967 F. Supp. at 1445.  In Mancuso, the court noted, "the expert must establish 'general causation,' by demonstrating that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause the specific types of injuries he alleges."  Mancuso, 967 F. Supp. at 1445 citing Wade-Greaux v. Whitehall Labs, Inc., 874 F. Supp. 1441, 1475 (D.V.I.), aff'd without opinion, 46 F.3d 1120 (3d Cir. V.I. 1994).  In Zwillinger and Mancuso, the District Courts recognized the necessity of establishing general causation, and noted that the application of a differential diagnosis even if done properly,

goes to the establishment of specific causation, not general causation.  See Zwillinger, 1998 U.S. Dist. Lexis 21107 at 57; Mancuso, 967 F. Supp. 1437 at 1445.   These District Courts recognized the distinction between the admission of a differential diagnosis for the purpose of establishing specific causation as opposed to establishing general causation.[3]

There are cases in the Second Circuit where District Courts have admitted differential diagnosis methodology.  The Second Circuit Court of Appeals affirmed those District Court's admission of that expert testimony ruling that it was not an abuse of discretion for those courts to admit the expert.  McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir.  1995); Zuchowicz v. United States of America, 140 F.3d 381 (2d Cir. 1998).  In both cases the experts had relied in part on differential diagnosis.

In McCullock, the court concluded that the District Court's admission of the expert's testimony  was not manifestly erroneous because the "scientific knowledge" element of Daubert was satisfied where the doctor had based his opinion on a range of factors, only one of which was a differential diagnosis.  Id. at 57.  In fact, the Court of Appeals noted that one of those factors included the expert's reference to various scientific and medical treatises.  Id. at 1044.

---

[3]  In Baker v. Metro-North Railroad Co., 2003 U.S. Dist. Lexis 19146 (D. Conn. 2003), the District Court recognized the distinction between general causation as opposed to the application of a differential diagnosis as a "method of analyzing specific causation."

In <u>Zuchowicz</u>, in reviewing the District Court's decision to admit the expert testimony under a highly deferential abuse of discretion standard, the Court of Appeals affirmed the District Court's conclusion that the experts "based their opinions on methods reasonably relied on by experts in their particular fields." <u>Id.</u> at 388.   In <u>Zuchowicz</u>, the differential diagnosis was only one factor the District Court had taken into consideration in admitting the expert. Importantly, a review of the District Court's decision to admit the expert testimony reveals that the proffered experts relied on substantially more than a differential diagnosis alone. <u>Zuchowicz v. United States of America</u>, 870 F. Supp. 15 (D. Conn. 1994).  In fact, the experts relied upon studies they had conducted, and animal and epidemiological studies on the issue of the link between the substance and the injury.  <u>Id.</u> at 19-20.  The court noted that their opinions were also based on medical literature concerning the substance and the plaintiff's claimed illness.  <u>Id.</u> at 20.

A review of <u>McCullock</u> and <u>Zuchowicz</u> demonstrates that, although they do involve the application of differential diagnosis, they do not stand for the proposition that this method proves general causation absent additional factors.  Some Second Circuit District Courts have since interpreted the <u>McCullock</u> decision to mean that a "differential diagnosis is a reliable basis to prove general causation in this circuit." <u>Perkins v. Origin Medsystems, Inc.</u>, 299 F. Supp. 2d 45, 57 (D. Conn. 2004) <u>citing</u> <u>Plourde v. Gladstone</u>, 190 F. Supp. 2d 708, 722 (D. Vt. 2002).  <u>Cf.</u> <u>Amorgianos v. National Railroad Passenger Corp.</u>, 303 F.3d 256 (2d Cir. 2002),  <u>Zwillinger v.</u>

Garfield Slope Housing Corp., 1998 U.S. Dist. Lexis 21107 (E.D.N.Y. 1998), Mancuso v. Consolidated Edison Co. of New York, 967 F. Supp. 1437 (S.D.N.Y. 1997).  Although the defendant recognizes that the District Courts in Perkins and Plourde have relied upon McCullock in support of the proposition that a differential diagnosis substitutes for general causation, it is the defendant's position that those District Court's  misapplied McCullock and interpreted it in an overly broad manner.  In fact, McCullock does not state that a differential diagnosis proves general causation as these District Courts have interpreted it to mean.

        Despite its liberal interpretation of McCullock, the Perkins court recognized other federal courts that refused to allow general causation to be substituted by a differential diagnosis. Perkins, 299 F. Supp. 2d 57-58 Citing Hall v. Baxter Corp., 947 F. Supp. 1387, 1414 (D. Or. 1996) (noting that "a single differential diagnosis is a scientifically invalid methodology" for the purpose of demonstrating general causation"); In re Breast Implant Litigation, 11 F. Supp. 2d 1217, 1230 (D. Colo. 1998) (finding expert's conclusion that silicone auto-immune diseases as unreliable in absence of proof that silicone can actually cause the plaintiff's symptoms); Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 516 (W. D. Pa. 2003) (finding expert's opinion based solely on differential diagnosis, as unreliable because it "ignores the substantial evidence that a discernable cause is never identified with respect to a significant number of strokes, despite careful evaluation."); Cavallo v. Star Enterprise, 892 F. Supp. 756, 771 (E.D. Va. 1995)

- 16 -

(disapproving the use of differential diagnosis to prove general causation in a toxic tort case because "a fundamental assumption underlying this method is that the final, suspected 'cause' remaining after this process of elimination must actually be capable of causing the injury").

The trend among circuits not to admit expert testimony based on differential diagnosis as a substitute for general causation is not limited to those cases cited in Perkins.  See e.g. Goebel v. Denver & Rio Grande Western R.R. Co., 346 F.3d 987, 998 (10th Cir. 2003) ("a reliable differential diagnosis is admissible in this circuit given a valid showing of general causation."); Cagle v. The Cooper Co., 2004 U.S. Dist. Lexis 8473 at 19 (C.D. Cal. 2004) (attached hereto as Exhibit "J")  ("It is important to note, however, that differential diagnosis cannot demonstrate general causation, because it assumes, without proving, that all of the potential causes considered are capable of causing the condition at issue. 'Indeed differential diagnosis assumes that general causation has been proven for the list of possible causes it eliminates.' Hall supra at 1413".); Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1211 (10th Cir. 2002); Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001); Black v. Food Lion, Inc., 171 F.3d 308, 312-14 (5th Cir. 1999).

The present case is analogous to cases where courts have precluded expert testimony because of the lack of general causation.  For instance, in In re Breast Implant Litigation, 11 F. Supp. 2d 1217 (D. Colo. 1998), the court recognized that without proof that silicone could cause

the type of auto-immune disease the plaintiff claimed, the expert's differential diagnosis was inadmissible because it was not scientifically reliable. <u>Id</u>. at 1229.  The differential diagnosis approach confused two distinct burdens: general causation and specific causation.  <u>Id</u>.  Similarly, in the case at bar,  the proffered experts attempt to do the very same thing by drawing a casual link between a substance, fire extinguisher dust, which is not proven to cause lung nodules, under the guise of a differential diagnosis.

In <u>In re Breast Implant Litigation</u>, the court acknowledged the importance a differential diagnosis has to the question of specific causation.  Cognizant of the fact that the plaintiff's expert attempted to jump immediately to specific causation absent general causation proof, the court stated,  "it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination must actually be *capable* of causing the injury."  <u>Id.</u> at 1230.  (emphasis added).   This analysis is applicable to the case at bar because the proffered experts here also have put the cart before the horse by "ruling in" a cause of the plaintiff's condition with no scientific foundation supporting the theory that dust can cause lung nodules.  When the plaintiff's expert attempted to take this approach in the <u>In re Breast Implant Litigation</u>, the court ruled that "the causation testimony offered by the Plaintiffs is precisely the kind of subjective testimony that is inadmissible pursuant to Rules 702 and 703."  The court concluded "[d]ifferential diagnosis may be utilized by a

clinician to determine what recognized disease or symptoms the patient has, but it is incapable of determining whether exposure to a substance *caused* disease in the legal sense." Id. at 1230 (emphasis added).

The proffered expert testimony in this case is flawed and inadmissible because these is no proof of general causation.   A differential diagnosis requires the physician's consideration of *possible* causes of the condition.   McCullock, 61 F.3d at 1044.  Absent a showing that a substance can cause a condition, the element of general causation, it cannot be "ruled in" as a *possible* cause.  The plaintiff's experts have no scientific and reliable basis for including the fire extinguisher dust as a potential cause.  (Exhibit F, p. 9, line 23;  Exhibit E, p. 14, line 9; p. 17, line 15-18).  Dr. Gulati's research turned up absolutely no results on this issue of causation. (Exhibit F, p. 80, line 24-25; p. 81, line 1).  Both doctors admit that this is the first time they have ever seen such a case.  (Exhibit F, p. 11, line 20-22; p. 80, line 23; Exhibit E, p. 18, line 2).

Dr. Gulati actually refers to this case as "bizarre" and testified that it is "groundbreaking" because it is the first time a link between the inert materials of a fire extinguisher has been made to the development of a lung nodule.  (Exhibit F, p. 81, line 2-9; E-mail from Gulati to Cullen attached hereto and referred to as Exhibit "K").  Dr. Gulati's own concern for the complete lack of literature supporting her conclusion is expressed in an e-mail she prepared to Dr. Cullen in which she states:

"This is a bit of a bizarre case and we should talk about the lack of literature surrounding this case, i.e. bizarre focal bronchiolectasis after random ingestion on a train (sic)."

 (Exhibit K).

Despite the doctor's "novel" findings in this case, neither has submitted this case to peer review.  (Exhibit F, p. 85, line 3-8).  Given the complete lack of proof of general causation in the form of scientific literature, the doctors' experience with this type of case, or anything other than a distant temporal relationship between the plaintiff's alleged inhalation and symptoms, Dr. Cullen and Dr. Gulati should be precluded from testifying on the issue of causation.

> **III.     EVEN IF THE COURT WERE TO ACCEPT A DIFFERENTIAL DIAGNOSIS ABSENT PROOF OF GENERAL CAUSATION AS A VALID METHODOLOGY TO DETERMINE CAUSATION IN THIS CASE, NEITHER DR. CULLEN'S NOR DR. GULATI'S APPLICATION OF THE DIFFERENTIAL DIAGNOSIS METHOD WAS VALID AND RELIABLE**

Although some courts have allowed the differential diagnosis methodology as a valid foundation for admitting an expert opinion, courts still require that the differential diagnosis be performed in a reliable manner by a qualified expert.  See generally McCullock v. H.B. Fuller Co., 61 F.3d 1038 (2d Cir. 1995); Zuchowicz v. United States of America, 140 F.3d 381 (2d Cir. 1998); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999); Turner v. Iowa Fire Equipment Co., 229 F.3d 1202 (8th Cir. 2000).  Courts do not unilaterally admit expert testimony on the issue of causation simply because the plaintiff's proffered expert uses the magic words

"differential diagnosis."  The mere use of the term does not bring an expert's testimony within

Daubert requirements.  Even absent proof of general causation, the proffered expert's testimony

must reliably demonstrate that the substance actually caused the injury in this particular case.

This is the element of specific causation.

Courts apply Daubert factors in their determination as to whether an expert is qualified

and whether they performed a valid and reliable differential diagnosis.  "To warrant

admissibility, it is critical that an expert's analysis be reliable at every step."  Amorgianos v.

National Railroad Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).  "When an expert opinion

is based on data, methodology, or studies that are simply inadequate to support the conclusions

reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."  Id.

citing Heller v. Shaw Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999).  "The reliability analysis

applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's

opinion, the link between the facts and the conclusion, et alia."  Id citing Heller, 167 F.3d at 155.

### A.    The Plaintiff's Proffered Experts' "Differential Diagnosis" is Unreliable

In order for a differential diagnosis to be admissible, it must be reliable and properly

performed.  Courts require that experts relying upon differential diagnosis methodology satisfy

Daubert standards in order to gain admittance.  Neither Dr. Cullen nor Dr. Gulati's "differential

diagnosis" meets those standards.

- 21 -

Although Dr. Gulati and Dr. Cullen have admittedly never seen a case like this before and have no scientific literature supporting their conclusion, based on one visit with the plaintiff, they opined that fire extinguisher dust caused his condition.   (Exhibit E, p. 14, line. 9; p. 17, line 15-18, p. 18, line 2; ; Exhibit F, p. 58, line 15-23).   A review of their approach to this case demonstrates that they have no foundation whatsoever for this conclusion.

Neither Dr. Cullen nor Dr. Gulati are the plaintiff's treating physicians.   (Exhibit F, p. 18, line 9-10).   They saw him one time at the request of his attorney solely for the purposes of litigation three years and seven months after the alleged inhalation incident.   (Exhibit F; p. 18, line 11-12, 10; Exhibit G, p. 2).

Dr. Gulati, who spent more time with the plaintiff than did Dr. Cullen, has never seen a case like this before, and her research revealed no scientific support for her "groundbreaking" conclusion in this case.   (Exhibit F, p. 81, line 2-9; Exhibit K).   Her background in performing consults and attempting to determine the etiology of lung nodules is scarce.   She could only recall one instance where she was called upon to comment on the etiology of a cancerous lung nodule, which she related to asbestosis.   (Exhibit F, p. 21, line 6).   She admitted that the plaintiff could, in fact, have been her very first case in attempting to determine the etiology of a lung nodule. (Exhibit F, p. 22, line 15-17).

Dr. Cullen saw the plaintiff once for a total of twenty minutes.  (Exhibit E, p. 47, line 13-14).  During this visit, the plaintiff's symptoms were improved, if existent at all.  (Exhibit E, p. 54, line 5-6; Exhibit F, p. 73, line 3-5).  Dr. Cullen cannot speak to the symptoms of which the plaintiff complained immediately after the inhalation incident because this doctor did not know or treat the plaintiff before the incident or anytime shortly thereafter.  (Exhibit E, p. 54, line 7-9).  Dr. Cullen admittedly has no idea what, if any, changes have resulted in the plaintiff's voice, cough, or function. (Id.).

After the short one time visit, the doctors jointly drafted a report stating, "it is our opinion that the inhalation accident caused the resulting nodules."[4]  (Exhibit H).  Both doctors agree that the materials in a fire extinguisher are inert and there is nothing unique to the composition of those materials that caused a problem.  (Exhibit F, p. 56, l. 10-13; Exhibit E, p. 11, line 22-24).  In fact, Dr. Cullen found the material safety data sheet (MSDS) for the fire extinguisher irrelevant to this case because it did not identify the size of the fire extinguisher material particles.  (Exhibit E, p. 13, line 7-8).  Dr. Cullen testified that a bronchiole of the lung, the area of the bronchiolectasis, has a diameter of no more than five microns.  (Exhibit E, p. 9, line 8-17).  He indicated that for a particle to make it all the way down to a bronchiole, it would have to be

---

[4]  Despite the fact that the doctor's refer to both nodules in the report, the experts agree that the smaller nodule was not caused by the February, 2000 incident.  See footnote 2.

less than five microns.  (Id.).  Despite his testimony that the particle size accounts for the fact that the plaintiff suffered from bronchiolectasis, a condition in the very small airways, the doctor never determined the size of the particles from the fire extinguisher. (Exhibit E, p. 15, line 24-25, p. 16, line 1-6).  The doctors do not provide an explanation as to how they know the fire extinguisher dust made it into these very small airways, the bronchioles, when they do not even know the size of the fire extinguisher material particles.

A fundamental component of a reliable differential diagnosis is the doctor's consideration of possible causes to "rule in" and the process of "ruling out" other possible causes until left with a conclusion as to cause.  Neither doctor took this approach to this case.  In fact, Dr. Cullen readily admitted that he did not consider *any* other causes for the lung nodule and bronchiolectasis other than the inhalation incident relayed to him by the plaintiff.  (Exhibit E, p. 18, line 11-12 ).

The extent of other possible causes for the plaintiff's condition and the lack of consideration given these possibilities by the experts is striking.  The doctors are in complete agreement that a nodule can be caused by an old infection.  (Exhibit F, p. 52, line 12; Exhibit E, p. 20, line. 10-15).  In fact, Dr. Cullen admits that the plaintiff might not even remember such an infection or realize he had it.  (Exhibit E, p. 30, line 15-17).  When Dr. Cullen did finally consider other causes of the plaintiff's condition, the doctor testified he would consider a small

aspiration (stomach contents or food going down the wrong pipe), pneumonia, and an impaction

of mucous that could turn to stone over time and leave an obstruction  (Exhibit E, p. 18, line 21-

25; p. 19, line 1, 11-20).   Dr. Gulati only considered a foreign body ingestion.  (Exhibit F, p. 96,

line 17-19).  She did not consider any type of infection, which she previously testified likely

caused the smaller nodule, the plaintiff's cigar smoking (which both doctors knew little about),

or any type of aspiration of another object.

Neither doctor took into consideration the other smaller nodule on the plaintiff's lung and

its cause.  Dr. Gulati confirmed that two lung nodules in the right lung were identified including

a 1.5 centimeter right lower lung nodule and a 3 millimeter right lung nodule.  (Exhibit F, p. 35,

line 1-8).  She admits that she does not know which nodule is older or newer, and she cannot tell

whether the smaller nodule existed in February, 2000.  (Exhibit F, p. 40, line 10-12; p. 41, line 5,

19-20).  She admits that in her attempt to determine the etiology of the plaintiff's condition, she

was not at all concerned with the smaller nodule.  (Exhibit F, p. 49, l. 13-14, 25).  According to

her, the smaller nodule could have been caused by an old infection, yet she failed to consider an

old infection as the cause of the larger nodule.  (Exhibit F, p. 52, line 12-13).  Like Dr. Gulati,

Dr. Cullen did not know what caused the 3 millimeter nodule in the same lung, but he testified

that it was likely caused by an old infection, one that the plaintiff may have never even been

aware of at the time.  (Exhibit E, p. 29, line 20-22; p. 30, line 7-9, line 15-17).  He also has no explanation as to why he did not consider an infection as the cause of the larger nodule.

The present case is similar in many respects to cases in which courts have precluded expert testimony due to the improper and unreliable application of a differential diagnosis.  In Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256 (2d Cir. 2002), the Second Circuit Court of Appeals affirmed the district court's exclusion of the plaintiff's expert testimony.  The plaintiff claimed that the inhalation of spray paint fumes caused central nervous system dysfunction and neurological problems.  Id. at 260.  The plaintiff's treating physician sought to testify as to her opinion that the paint exposure caused the condition based largely on the timing of the onset of symptoms, their manifestation, and her elimination of other known causes of the plaintiff's ailments such as diabetes.  Id. at 262.  The proffered testimony was akin to that in the present case.

In its analysis, the Amorgianos court noted that "[t]o warrant admissibility, it is critical that an expert's analysis be reliable at every step."  The court further noted "the Daubert 'requirement that the expert testify to scientific knowledge – conclusions supported by good grounds for each step in the analysis – means that any step that renders the analysis unreliable under Daubert factors renders the expert's testimony inadmissible.  Id. citing In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994).

Despite the fact that the proffered expert in Amorgianos was the treating physician, claimed to have considered all possible causes, and relied on published articles, factors which do not exists in the present case, the court deemed the expert inadmissible.  The court concluded that "the analytical gap between the studies on which she relied and her conclusions was simply too great and that her opinion was thus unreliable."  In the present case, the plaintiff's experts have no studies or literature to rely on at all, and they admittedly did not consider other possible causes as did the Amorgianos expert.

Mancuso v. Consolidated Edison, 967 F.Supp 1437 (S.D.N.Y. 1997) aff'd in relevant part 2000 U.S. App. Lexis (2d Cir. 2000) (copy attached hereto as Exhibit L), is also closely on point with the case at bar.  In Mancuso, the proffered expert, Dr. Schwartz, sought to testify that the plaintiff's exposure to PCB's caused certain injuries to the plaintiffs.   The court excluded the plaintiff's expert doctor finding the doctor did not perform a proper differential diagnosis.  The court was not persuaded by the plaintiff's contention that the scientific community generally accepted that PCB's caused ailments similar to the plaintiff's where the sole support advanced for that assertion was the opinion of the plaintiff's expert absent any supporting literature.  Id. at 1447.  The Mancuso court recognized that "it is improper for an expert to presume that the plaintiff 'must have somehow been exposed to a high enough dose to exceed the threshold [necessary to cause illness], thereby justifying his initial diagnosis.  This is circular reasoning.'"

Id. at 1451 citing O'Conner, 807 F.Supp. at 1396; Cavallo, 892 F.Supp. at 764, n.12; Claar v. Burlington R.R. Co., 29 F.3d. 499, 502-03 (9th Cir. 1994).

The Mancuso court acknowledged that a valid differential diagnosis generally involved consideration of all relevant potential causes of a plaintiff's symptoms and eliminating alternative causes based upon physical examination, clinical tests, and a thorough case history. Id. at 1446. In Mancuso, the court found it particularly disturbing that the doctor failed to exclude other possible causes of the plaintiff's condition. Id. at 1451. Dr. Schwartz's testimony is remarkably similar to Dr. Cullen's testimony. Dr. Schwartz testified as follows:

> "Q:  Did you do anything to exclude other substances as the cause of any of the conditions?
> A:  No.
> Q:  Why not?
> A:  I saw symptoms and syndromes which were fully accountable by PCB exposure and felt that based upon the information as given to me and subsequently which I read, the diagnosis is PCB exposure."

Id. at 1451.

In comparison, at one point, Dr. Cullen testified as follows:

> Q:  What other causes did you consider for Mr. Arich's bronchiolectasis other than the inhalation of the fire extinguisher dust?
> A:  To be very candid, I didn't actually consider too many and the reason is I think the timing is, the timing from my point of view actually speaks for itself. So the real answer to your question is *I considered exactly none, . . . .*

(Exhibit E, p. 18, line 5-12) (emphasis added).

- 28 -

In <u>Zwillinger v. Garfield Slope Housing Corp.</u>, 1998 U.S. Dist. Lexis 21107 (E.D.N.Y)
(August 17, 1998) (Attached hereto as Exhibit I), the plaintiff alleged injuries caused by the
chemicals from a newly installed carpet.    In <u>Zwillinger</u>, the court found that the proffered expert
did not prove general causation, and even if the expert had proved general causation, he failed to
establish specific causation through a valid differential diagnosis.  The court excluded the
plaintiff's proffered expert, Dr. Gray, because his testimony was too speculative and untested,
and he failed to cite to a single study that provided empirical support for the plaintiff's claim.

Dr. Gray's experience with the <u>Zwillinger</u> plaintiff is similar to that of Dr. Gulati's and
Dr. Cullen's in this case.  Dr. Gray met with the plaintiff almost two years after her alleged
injury, he took her history, noted the symptoms she described at the time of the incident, and he
had her complete a questionnaire relating to environmental exposures.  <u>Id</u>. at 13.  Dr. Gray
performed a physical examination, which he conceded did not reveal anything of significance to
the plaintiff's exposure, and he reviewed her medical records.  <u>Id</u>. at 14.   Dr. Gray ordered
additional laboratory tests to compare to test data from tests he had performed on other patients, a
step neither Dr. Gulati nor Cullen took in the present case.  <u>Id</u> at 14.  In addition, Dr. Gray relied
upon animal tests performed by another doctor testing exposure to the carpeting at issue in that
case.  <u>Id</u>. at 35.  Dr. Gray concluded that the exposure to the carpet chemicals caused the

plaintiff's condition based upon the temporal relationship between installation and onset of symptoms, the continued symptoms, and lab findings. Id. at 16.

Despite Dr. Gray's efforts in Zwillinger, the court excluded his testimony finding that he "failed to conduct a thorough, scientific differential diagnosis." Id. at 61. Dr. Gray based his opinion in large part upon the plaintiff's report of her symptoms and timing of the same. If Dr. Gray's more thorough approach in Zwillinger did not satisfy Daubert requirements, Dr. Gulati and Dr. Cullen differential diagnosis here did not include the steps and methodology necessary to satisfy Daubert.

Turner v. Iowa Fire Equipment Co., 229 F.3d 1202 (8th Cir. 2000), is also similar to the case at bar. In Turner, the plaintiff alleged that fire extinguisher discharge, including a white powdery substance composed primarily of baking soda, caused her respiratory problems. Id. Her problems included shortness of breath, as well as itchy skin, and headache problems, all of which became chronic. Id. The Appellate Court affirmed the District Court's exclusion of the plaintiff's expert because the expert's causation opinion did not satisfy Daubert standards of scientific reliability. Id.

Many aspects of Turner are the same as the case at bar. The excluded expert in Turner, Dr. Hof, based his causation opinion relating the plaintiff's reactive airway disorder to her exposure to the chemicals from the fire extinguisher discharge on the plaintiff's medical history

(as provided by the plaintiff) and temporal relationship between the fire extinguisher incident and the onset of symptoms. Id. at 1205-06. The plaintiff contended that Dr. Hof's testimony was admissible because it was based upon a differential diagnosis. Id. at 1207. Dr. Hof admittedly did not rely upon any literature supporting his conclusion, and he admitted that he did had not considered other factors that may have caused the plaintiff's condition. Id. at 1206-07.

In Turner, the court noted that a medical opinion on causation based on a *proper* differential diagnosis can satisfy Daubert (the same approach recognized in the Second Circuit), but the court concluded that Dr. Hof had not performed a proper differential diagnosis for the purpose of establishing specific causation. Id. at 1208. Dr. Hof admitted he made no attempt to consider other possible causes just as Dr. Cullen admitted in the present case. The Turner court determined that because Dr. Hof had not systematically ruled out all other possible causes, his testimony was excluded.

In Heller v. Shaw Industries, Inc., 167 F.3d 146 (3rd Cir. 1999), the Third Circuit Court of Appeals analyzed the reliability of an expert's opinion based upon differential diagnosis. In Heller, the Court of Appeals affirmed the District Court's exclusion of expert testimony on the grounds that it was seriously flawed and thereby unreliable. In Heller, the plaintiff claimed that chemicals from a newly installed carpet caused her respiratory problems. Id. The proffered expert, Dr. Papano, sought to testify that he had performed a differential diagnosis in which he

alleged to have ruled out other causes, and that based largely on the temporal relationship between the plaintiff's symptoms and the carpet installation, the carpet caused the condition. Id. at 151. The present case is very similar to Heller in that all experts rely almost entirely on temporality in support of their opinions.

The Heller court excluded Dr. Papano's testimony for a number of reasons. The court was not satisfied with the expert's explanations as to why he had ruled out other possible causes when all of his reasons for ruling out those possibilities were grounded solely in the alleged strong temporal relationship that he claimed existed in that case. Id. at 154. In affirming the exclusion of Dr. Papano's testimony, the court determined that the trial court had properly considered the following factors: 1) Dr. Papano had relied on few, if any, studies linking the exposure to the condition, 2) Dr. Papano had a weak response to the defendant's proffered alternative theories as to the cause of the plaintiff's illness, and 3) Dr. Papano had relied heavily on a temporal relationship which was deemed unreliable. Id. at 158-59. The court concluded that given the above, the expert's testimony did not reliably flow from the data and methodology. Id.

In the case at hand, the proffered expert's application of differential diagnosis was unreliable in that they failed to first "rule in" the fire extinguisher material as a possible cause, and certainly failed to "rule out" other possible causes because they did not consider any other

causes of the condition.  The differential diagnosis methodology employed by these doctors is similar to the type of analysis which has been rejected by the courts in <u>Amorgianos</u>, <u>Mancuso</u>, <u>Zwillinger</u>, <u>Turner</u>, and <u>Heller</u>.  As such, Dr. Cullen's and Dr. Gulati's testimony should be excluded as insufficient under <u>Daubert</u>.

<b><u>CONCLUSION</u></b>

It is the defendant's position that under <u>Daubert</u> and <u>Joiner</u>, the proffered experts' opinions are not reliable given the analytical gap not only in the complete lack of general causation proof in support of their underlying "novel" theory that fire extinguisher dust can cause bronchiolectasis and lung nodules, but also in their application of the differential diagnosis methodology.

For the foregoing reasons, the defendant respectfully requests that the court enter an order that the plaintiff's experts, Dr. Cullen and Dr. Gullati, be precluded from testifying at the trial of this matter concerning the causal relationship between the plaintiff's medical condition and his work with Metro-North Railroad Company.

THE DEFENDANT,
METRO-NORTH RAILROAD


By:_____
       Charles A. Deluca (ct05255)
       Lauren E. Abbate (ct25696)
       Ryan, Ryan, Johnson & Deluca, LLP
       80 Fourth Street, P.O. Box 3057
       Stamford, CT   06905
       Phone No. 203-357-9200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2004, a copy of the above was mailed to the following

counsel and pro se parties of record:

Charles C. Goetsch, Esq.
Cahill & Goetsch, PC
43 Trumbull Street
New Haven, CT 06511-1059
Attorney for Plaintiff, Gerald Arich

_____
Lauren E. Abbate, Esq.

I:\Procases\205.121\MotionPrecludeExperts.wpd
205.121

- 35 -